Good morning. May it please the Court, my name is Doug Smith and I represent the appellant Sean Prince. I'd like to reserve one minute for rebuttal. Mr. Prince was a pretrial detainee who was incarcerated at the South Bay Detention Facility in San Diego. He was injured severely in a riot and sustained injuries to his hand and wrist. He requested medical care from deputies at the facility that night but was denied medical care. After that point in time, he repeatedly requested medical care, but he was not x-rayed, even though he told them that his hands were broken for over a week. After that, nobody reviewed the x-rays for at least two weeks, and he didn't receive surgery on his hand for at least a month. As a result, he sustained permanent injuries to his hand that will cause him intermittent pain and limited range of motion for the rest of his life. Mr. Prince filed a lawsuit naming the two deputies and the sheriff in charge of the facility, and the defendants in response moved for summary judgment with respect to his claims regarding medical attention. They did not move with respect to an equal protection claim that he brought. While the district court concluded that Mr. Prince's claims were serious as a matter of law, it nonetheless granted summary judgment on the medical claims and also sua sponte dismissed the equal protection claims. That ruling would explain what you think the analytical framework is for analyzing these pre-detainee or pre-trial detainees' medical claims. Courts seem to reference the Eighth Amendments delivered at a different standard, but then include language that says that that is the minimum. But I don't think I've seen a case, perhaps you have, which actually sets forth what the proper analytical framework is for analyzing medical claims of pre-trial detainees. What do you think that is? Your Honor, I believe it is set out in Jones and Mink, two cases from this circuit, and those cases indicated that all that's really required is a showing that there was punishment. The Eighth Amendment's inapplicable to the pre-trial detainees. They're subject to a due process clause. And under that, any kind of punishment to a pre-trial detainee is sufficient to establish a violation. So it's not necessary to establish deliberate indifference. Now, it's true that the cases don't go into a lot of detail about what that lesser standard is. There are a couple options available to the Court. One, it seems to me that just a requirement of punishment indicates that you don't need to undertake an inquiry into the intent of the actors. If it's sufficient that punishment is established, then that should be sufficient without going into what they believe subjectively or objectively. Another possibility is instead of a recklessness type of standard for deliberate indifference, maybe negligence or a strict liability standard is sufficient in cases of pre-trial detainees. Well, looking at the time frames involved, it's what we're looking at is the request for medical attention in the evening and then no one doing anything until the next day. Is that correct? Well, all the... Phase one. That's phase one. And all that was done the next day was he saw a nurse, but he wasn't given any x-rays, even though he told them his hand was broken and it was swollen. Right. So in terms of the individuals, because you have the two guards that are in the evening, so you have that time frame. Yes. Okay. Is he also alleging a claim from that point until he had his surgery? Or it's a little unclear what your, how to match up your time frames with the defendant's. Yes, Your Honor. He is alleging a claim for the subsequent time period. And I think the way Your Honor suggested breaking it up is correct. The failure to send him to the hospital immediately that night was attributable to the deputies and also to the sheriff's failure to supervise the deputies. But then he also alleged in his complaint on, and it's in the record on page two of the appendix, that the sheriff was responsible for medical care at the facility. And so he, as a pro se prisoner, is entitled to the benefit of the doubt in his pleadings and has made an allegation that the sheriff was responsible for medical care at the facility and that he didn't get adequate medical care. And there's a whole series of instances after that where it was not just that somebody made a mistake, it was that it wasn't available to him. Nobody gave him an x-ray. And when the x-rays were taken, they were not reviewed immediately. Nobody looked at them. So it's not a... You see, one of the difficulties with this, just, there's two issues that I'd like you to address. Number one, it seems that you don't really distinguish between the sheriff and his official and in his personal capacity the way the briefing is done. And so it's unclear what is the alleged policy that's in play that we would be looking at in terms of county policy. And then the second thing, if delay is the issue, which seems to be his primary thrust in his complaint, lots of medical people looked at this and didn't really figure out what it was for quite a while. Well, I don't think... In different forms. That's not really correct, Your Honor. First, there were no x-rays taken for a week. So nobody was looking at anything. They didn't do the test that was required to even be able to look at it. And then after that, there's... And the x-rays occurred on September 22nd. The riot was on September 13th. September 29th was the first time anybody looked at it. The district court said it was unclear who was looking at these x-rays. I know that the defendants maintained that there was a physician who did look at them and concluded that there wasn't a problem. And then after that, then the surgery occurred later on after they diagnosed her. That was about a month later. But really, we're talking about what Judge McInnes identified as phase one, right? That's the time frame. I think what bothered the district court, and it is troubling on this record, is that if you do say, look, nobody else, even trained medical personnel, really couldn't identify these injuries, then what... How can we apply liability or impute liability to these deputies for failing to observe in phase one? Well, we know who could have identified the injuries, and that was the physicians who ultimately diagnosed them at the hospital. And had the deputies sent him to the hospital, it's likely, and he's entitled to the inference, that his condition would have been diagnosed by those same physicians who ultimately did diagnose it. Our contention is that there just weren't adequate facilities at the... Or adequate medical care at the detention facility in order to... Well, you know what? They don't need to have a whole hospital there. I mean, going back to Judge Thomas, the real concern is, they look at it, the nurse thinks he has something, it doesn't look broken. Then he gets examined by a doctor who says there's no big deformity. I mean, that's an MD. So then they give him x-rays and more medicine, and then time goes on and they look, and the x-rays look normal, and you kind of go down the road, and it turns out that in the end he needs some surgery. But it's a long ways from saying that the fact that he got looked at by a nurse that morning is the reason that he needed surgery. There just seems to be a causation link that's missing here as a matter of law, but maybe you can fill us in on that. Well, I think with respect to the deputies, there's no causation link missing because, I mean, they could have sent him to the hospital where he would have been diagnosed. So they were above forecast of his injury. He was sent to a hospital and he was diagnosed, but he wasn't diagnosed, they said there wasn't really a problem when he went to the hospital. Well, that was at another detention facility. That wasn't at the UCSD hospital. When he went to the UCSD hospital, he was diagnosed, and that's where he could have been taken in the night of the riot. But because of the deputies' actions, he wasn't. With respect to the medical personnel, it's not that they were making mistakes necessarily. It's that they didn't apparently have, you know, they didn't have a physician there to look at the x-rays for two weeks. That didn't happen until two weeks later. That's not a matter of having somebody there who's just incompetent. It's a matter of they apparently weren't available to look at the x-rays, and that did cause delay that contributed to his injury. And the case law doesn't say that it needs to be a major contributor to the injury or a substantial contributor. Under the McGuckin case, that line was rejected. And so there is a link here. Maybe it's not the primary reason for his permanent injury, you know, each of these individuals' actions, but they did contribute to it, and so therefore they can be held liable, and summary judgment would be inappropriate with respect to them. Your time's about expired. We'll allow you a little bit of extra time for rebuttal, though. Okay. Thank you very much. Good morning, Your Honors. May it please the Court, my name is Dave Axman. I'm a Deputy on behalf of Sheriff Colander and Deputies De Los Reyes and Dunlop. I think with regard to the two deputies, it's correct for us to look precisely at how it's been characterized this morning, phase one. What happened during phase one, those 12 hours before Prince was actually seen in sick call? And in this regard, the District Court's order of summary judgment should be affirmed because Prince has not raised a genuine issue, a material fact, that the 12-hour wait before sick call harmed him at all. Isn't the, rather, isn't the inquiry whether or not there is a disputed issue of fact as to whether he appeared to have some injury that required reference? In other words, were those injuries appeared to be significant enough that a referral to a medical facility might have been warranted? Yes, certainly. Is there a disputed issue of fact about the appearance of the injuries in your judgment? Yes, there is. There is a, well, I'm sorry, I misstated that. There is not, I don't believe, a material fact with regard to how his injuries appeared to the deputies or to the nursing staff the next morning. And that's because the nursing staff, just 12 hours later, documented how Prince's hand appeared. It was not red or bruised. There was no, or there was some slight swelling on the dorsal aspect of it and some limited range of motion due to pain and nothing else. And that's why the nurse concluded that it was not an emergent situation, that she could administer over-the-counter medication and ice to use ice and elevate the hand. And that's what she did. So when you're looking at what the deputies were observing the night before, they were not observing any more than that, if that. So in evaluating... He says, I have a broken right hand, I need to go to the doctor. So we know it wasn't in the end broken, it was this other difficulty, but that we have to take as a given, because that's what he says. So if someone says to you, I have a broken right hand, I need to go to the hospital, and the deputy says, I'm not a nurse, you had your chance, how do we evaluate those facts? Because it seems that it's not disputed that those things took place. Well it is disputed. The deputy's response? Yes. However, that is not... At this stage, we have to draw the inferences in favor of the complaint, even though I gather from the answer, you're prepared, if you tried the case, to dispute it. Correct. So assuming that's true... Well, assuming that's true, that's certainly not commendable conduct on the part of the deputies, in terms of what they may have said, or even what they may have failed to do, in terms of responding to Prince's complaint, if in fact that's what he said. He said multiple things at different times, in terms of how he communicated with the deputies. But the district court did find, primarily based, I think, on what the nursing staff failed to find when they observed the injury the next morning, that there was insufficient information, despite whatever comments were made, or whatever self-diagnosis was offered by Prince, there was insufficient information for the deputies to actually draw an inference that he was at risk for substantial injury if he did not receive immediate medical care. What is the standard we should be looking at, in your view? I know it's murky, depending on how you read the cases, but at least as this Phase 1, 12 hours comes in, what are we judging for purposes of the liability standard? Well, I think we're left, almost by default at this point, with the concept of deliberate indifference. Were the deputies, was their conduct something that amounted to deliberate indifference? That's the case, that's the test under all of this circuit's jurisprudence. The departure has come recently with regard to civil detainees and criminal detainees who are in need of restorative treatment, and those are the decisions that come out of Jones v. Blanas and Oregon v. Mink. Those, though, do not apply to this case. It would be quite a leap for us to presume punishment based on language from jail condition cases when we're actually instructed under Bell and Farmer to subjectively evaluate the deputy's intent. What do we make of the language in the cases that basically says, it must be, deliberate indifference is the minimum standard, but it implies there's something else involved because it's a 14th Amendment rather than an 8th Amendment case. And if you have a case where you can't resolve it on deliberate indifference, I'm at a loss as to what standard we really ought to apply. Well, we have not briefed that, and I think it's a very complicated question. I think that the district court, though, in her opinion, recognized the problem and the comments from the Lully case that also recognized the problem and dealt with it by assuming what conduct would be required of the deputies had they been held to the highest standard. And the highest standard would require them to simply take Mr. Prince at face value, regardless of how he looks, regardless of the fact there's no protruding bones, no significant swelling, no redness, no bruising, no blood. Despite that, if he says, I need to go to the hospital, they're supposed to simply drop everything, I guess, and take him there. But that I don't think is the standard, and the district court judge determined that even if it had been, it wouldn't have made a difference because he would have been taken to the dispensary where all of the injured inmates were taken following the disturbance at the jail for evaluation preliminary to the decision to go to the jail. And that is reflected in Plaintiff's Exhibit A. And then that would lead to the nurse who said he doesn't merit going to the hospital. Exactly. And that was then followed up subsequently by the repeat physician examinations, the fact that Prince was seen every two to three days in response to every single sick call request, and the doctors and the nurses did not find evidence of a broken hand or even a serious injury. At Prince's request, Dr. Wynn over at Bailey Detention Facility went ahead and ordered an X-ray, and that X-ray was done a couple of days later on September 22. The results were sent out to diagnostic laboratories, which is reflected at SER 78 They were interpreted by the radiologist Dr. Paul Corey, who immediately faxed back the result to George Bailey that same day, and that is indicated at the top of the page where the fax transmittal information is located, as well as the bottom of the page where there's an indication it was received by Bailey on September 22 the same day. The SER regarding the medical entries for that day show the nurse looked at those results that day, saw they were negative, and determined that it was appropriate to schedule physician follow-up, which is exactly what occurred. Prince was then seen by Dr. Mallett. She looked at the X-rays and decided to go ahead and refer him, in view of the continuing complaints, not to San Diego Central Jail where he could be seen in orthopedics by Dr. Berti, who the record will show is actually a UCSD physician, as are all the physicians on contract for San Diego County Jails. That indication is at SER 32. It was Dr. Berti of UCSD down at the Central Jail who performed another evaluation of Prince and determined that additional X-rays were warranted. Those are the X-rays that were eventually interpreted differently and showed the dislocated and displaced bone. So what we're really, I think, looking at when you view this entire process in context is something akin to a person who is an HMO subscriber and goes to his or her personal physician, the primary care physician, with a complaint, and that physician doesn't deem it particularly serious, but it progresses. And ultimately, then, the primary care physician refers the patient out to the appropriate specialist, in this case orthopedics, and then the appropriate corrective action, medical treatment, is undertaken. And that's really what we have here. So when we're looking at Deputies De Los Reyes and Dunlop and what they did at night count or didn't do at night count during phase one, results must result in the conclusion, the very conclusion the district court reached. Oh, there must be a genuine issue of fact as to whether it might have reached the conclusion. I mean, that's the issue of summary judgment. I mean, I think the best argument they have is that, well, if taken as true, we simply, there was no referral simply because you said, well, you had your opportunity, I'm not a nurse, we're not going to refer you, if that is the reason for doing it. That's the best, I think, that they have at this point, plus the complaints that he had and said, my, I've got a broken arm, and so forth. And then we get into causation as well. The only question is whether any material, genuine case, material fact about that and the scenario that you've described. Justice Thomas, may I just reiterate that Plaintiff's Exhibit A addresses the issue of what the deputies were doing that evening in terms of sending people to the dispensary and also whether or not those people were sent to the hospital and who was doing that. And it was Nurse, I think, Bartolomew or something similar to that, who was actually in the dispensary making those evaluations and those determinations. And that's based on the Plaintiff's Exhibit. Very good. Your time has expired. Yes, thank you very much. I know you didn't get to chat about the, talk with us about the sheriff's liability, but your briefing, I think, has covered that. Thank you. I know that HMOs have a bad reputation, but I think that if any one of us went to our broken hand, they wouldn't wait nine days to give us an x-ray. And Your Honor is correct that we have more than just Mr. Prince's say-so in this case that he told the deputies his hand was broken. They, it's their own words that, where they acknowledge, you had your chance to go to the hospital. They don't say, I don't think you had an injury. I don't think your injury is serious. They recognize it's a serious injury, but say, you missed your chance to go to the hospital. Well, I'm not sure they recognize it was a serious injury. And that, that, you know. And then I'd also point Your Honor to his cellmate's affidavit where he said he recognized that his hand was damaged and told him he should file a grievance. That was another piece of evidence that was submitted in the record that raises a material issue of fact. Thank you. Thank you both for your arguments. The case has heard will be submitted.
judges: Thomas, McKeown, King